We move to the fifth case this morning, Sims v. New Penn Financial. Good morning, Your Honor. Good morning, Pastor Sims. Is this the second person on the case, your spouse? Yes, Tiffany is my wife. She has a... I know you cannot represent her. I understand that. The argument is for myself, Your Honor, as an appellant. I'm here on behalf of myself, Pro Se, Your Honor. I seek reversal of the magistrate judge's grant of summary judgment. We believe the magistrate judge's determination was made in error. It argued against itself, failed to apply the law to the facts on the record, and was contradictory, as I will point out in some detail. There are genuine issues of material fact existing as violations of the Equal Credit Opportunity Act. But in this case, key evidence was overlooked, key details were glossed over, and there are some clear misstatements of facts in the magistrate judge's order. I believe an accurate statement of facts would have mandated that we be allowed to present this case to a jury, which would have undoubtedly ruled in our favor. Here are some of the facts of the evidence on the record. In November 2008, I put $12,000 down on a home and made $1,400 payments up until December of 2009, when we became aware of the foreclosure. Immediately after we became aware of the foreclosure, in January 28, 2010, I sent a letter to the defendant's outside counsel requesting to assume the mortgage before the hearing was had. And the reason that there was an assumption, my background in another life was initially with General Electric Credit when I got out of Marine Corps, and I became a collection manager and experienced in commercial paper of all types. We had a $500 million portfolio, and General Electric required that all of the managers understood all types of commercial paper. So the quickest way in this situation to address the situation that we were faced with was simply to apply for an assumption. Assumptions usually take 30 days. They're beneficial because there are no closing costs, and the fees are a lot less. So we sent a letter to outside counsel. In an email, he responded February 22, stating that an assumption was possible. We just need to obtain John Tiffany, who at that point was a mortgagee, his consent, and we proceeded to do that. In March 17, 2010, one month after we got the response back from outside counsel, we received the consent from Mr. Tiffany. A hearing was held in May 2010 when we met outside counsel. For four years, no application was sent, none. Although the district court asserted without a whiff of evidence that we had in fact abandoned our efforts during those four years, we continued to fight, as the record showed, for our home. In fact, what happened was I filed a Chapter 7. When John Tiffany, in 2012, filed a Chapter 7, I filed an adversary. The result of the adversary was Judge Deese, the bankruptcy court, signed off on a settlement that allowed us to have a quit-claim deed. We also filed a complaint, which is part of the record, with the Attorney General because John Tiffany was a realtor and had essentially stolen our money. In December 2013, Resurgent Capital, in response to our request for an Attorney General to investigate why we'd been denied the assumption, sent a letter back saying they don't know how to get in contact with Mr. Tiffany. This is three years after their outside counsel received the letter from Mr. Tiffany's attorney. We had sent the consent in March 2010. Keep in mind also, when Mr. Tiffany filed for Chapter 7, that the mortgage company obviously was a party to that. They were aware of Mr. Tiffany's counsel. They were also aware of his home address based on the filings in the mortgage court. Only in December 2014 did we get the actual application. In December 2014, we completed and faxed and emailed and snail-mailed it several times. They claimed they didn't get it. In response, we filed in 2015 several complaints with the Consumer Financial Protection Bureau. They began filing for a share sale. We'd file a complaint. They'd withdraw the share sale, and then they changed the terms of the agreement, the application that was sent, now demanding that we pay back interest and catch up the loan. Finally, in March of 2015, the defendant claimed it needed authorizations again from John Tiffany. Five years after it had received, and also in the letter of March 2015, it indicated it can't even tell us what the balance was until they received the authorization, which they had received. Additional evidence is there's no affidavit from the foreclosure counsel denying he discriminated against us. All this happened after he saw us at a hearing in 2010 on foreclosure. There's no affidavit from the employee at ShellPoint that said that's how they do us. She was African American. They could have provided an affidavit refuting that. They didn't. Pastor Sims, where do things stand today? There's a lot of history that you've quite eloquently recaptured here, but are you finally getting to the end of this? Well, what we had to do was after the ruling of the magistrate court, they again filed for a share sale, and we had to file a Chapter 13. We're in a Chapter 13 proceeding right now. I am individually in a Chapter 13 right now. So that's where this is at right now, in a Chapter 13. To assume the mortgage, and who's the debtor? I am the debtor based on the land contract and the quitclaim deed that Judge Deese agreed to. We assumed at that point, Judge Deese and the Chapter 7 trustee assumed that that would put us in line to have the assumption done. It didn't. The district court said without any evidence in the record that it appears that for four years we did nothing. That's not true. It's in the record. It also argued, the district court found that, well, Resurgent is who started this thing, and they were bought out by ShellPoint. So what is ShellPoint's liability? Well, first of all, for three years Resurgent did nothing on an assumption once we had given the authorization, which their outside counsel requested. Secondary, the record shows on October 1st, 2013, ShellPoint Partners LLC announced its wholly owned subsidiary, New Penn Financial, had acquired Resurgent and continued to service the mortgage portfolios. The district court wholly ignored the fact that for three years Resurgent did nothing, but it also ignored successor liability law applies here. Teague v. Thomas Bets Power Solutions LLC, number 12-3029-7, circuit 2013. The court also ignored the clear evidence of disparate treatment. Clearly, no company is in business to refuse to give someone an application for eight years. That defies imagination. Disparate treatment is when a lender treats an applicant differently based on one of their prohibited basis, and we're arguing that it was clearly because of race. But I think even more importantly, when you look at this and you understand that this was supposed to be nothing more than a simple assumption, and here we are eight years later with the last communication with ShellPoint, hey, we still don't have the authorization. Your Honor, I'm going to stop. There's a minute and 10 seconds left. I'm going to use rebuttal, but we're just simply asking that the court look at the record, understand the magistrate judge misapprehended the record, and we're asking for reversal. We believe there's enough evidence to go to trial on this. Thank you. Thank you, Mr. Pastor. Mr. Hankin. Yeah, thank you, Your Honors, and may it please the court, Jeff Hankin on behalf of the FLE, New Penn Financial LLC, DBA, ShellPoint Mortgage Servicing. Obviously, we're here on the district court judgment, granting summary judgment in favor of my client, ShellPoint. Just to set the record straight, ShellPoint is the mortgage servicer in this case. The borrower under the underlying mortgage loan was John Tiffany. Mr. Sims was trying to assume the mortgage loan, and to really cut to the heart of the matter, the district court got it exactly right when they said that Mr. Sims simply failed to prosecute his case and was left with basically speculation and unsubstantiated allegations of racial discrimination. Kind of the threshold matter in this case is the standard that's applied in a credit discrimination case. This court found in Lattimore v. Citibank, a case from 1998, that in the credit discrimination context under the Equal Credit Opportunity Act, the traditional Title VII McDonnell-Douglas framework is typically not appropriate when it comes to credit, and the court did so for a very simple reason, and that is when the lender is deciding whether to make a loan, it's not a competitive situation like it is in the employment context. That is, the bank doesn't say, you know, there's going to be a mortgage loan on Friday, everyone apply, and we'll pick one person to, you know, have the benefit of this mortgage loan. You know, there aren't the suspicion that arises in the employment context when you have a minority applicant and a non-minority applicant competing for the same job, and the non-minority applicant gets the job. You know, there's no reason to shift the burden to the defendant. Well, in the employment context, there is a reason to shift the burden to the defendant because that raises a suspicion of discrimination. The same standard does not apply in the credit discrimination context. Would you go back and explain this Cox statement? How did that come up? And tell me the background around it. Yeah, so that actually, and you're referring to, and Mr. Sims alluded to it, there was his testimony at his deposition that an employee of Shell Point said to him on the phone, these people, you know how they treat us. Okay, that was his statement. That wasn't alleged in the complaint. That didn't come up until the deposition. Is Mr. or Mrs. Cox African-American? I don't know. That's an assertion, right? That's an assertion. Mr. Sims alleges that she was African-American, and the fact remains, he did nothing to really substantiate or corroborate that statement. He could have subpoenaed her to get her testimony as to what she might have meant by that statement. Shell Point provided the loan file, all the comment history and things like that. He could have pointed to the fact that this telephone call actually occurred, and none of that is in the record. All that's in the record is Mr. Sims' statement that he spoke with this individual by telephone. What's her relationship with regard to this transaction? At the time of the alleged statement, which would have been in March of 2015, I believe she was employed by Shell Point. And with regard to this particular transaction, what was her position? Did she have anything to do with it? I believe that she was in the, they call it the Lost Mitigation Department, and that's in charge of handling these sorts of situations when, you know. She was involved in it, I guess. Yeah, it wasn't, she wasn't, you know. She was employed by Shell Point and she was involved to some extent. The extent of her involvement was never substantiated in the district court. So, you know, Mr. Sims really lays forth a number of allegations that I sort of, that he attempts to present a case of discrimination based on circumstantial evidence. I really fall into three buckets. He alleges that Shell Point delayed in processing the loan application, that they discouraged him from pursuing the loan assumption, excuse me, and that he was treated differently based on his race. On the first bucket of the argument that Shell Point delayed, and that's, you know, suspicious and that's evidence of discrimination, Shell Point didn't begin servicing this mortgage loan until March of 2014. Okay. Mr. Sims reached an agreement with the borrower, John Tiffany, to assume the loan. The lender wasn't part of this agreement. And, in fact, there was a separate servicer at the time that was servicing the loan. So Shell Point parachuted into this case when it took over servicing of the loan in March of 2014. And it was a new company and acquired the rights to service this mortgage loan. So the district court got exactly right when they say the record was really devoid of any evidence that would link Shell Point to any of these actions in the preceding four years. As to this successor liability, I mean, Mr. Sims raised it on appeal basically for the first time. That was not litigated in the district court. There was no assertion that Shell Point was the successor. And to the extent that that wasn't raised, and it's raised for the first time on appeal, that argument is waived. As far as his assertion that Shell Point discouraged him from, you know, the fact of the matter remains that there were a number of written communications to Mr. Sims throughout the loan assumption process beginning in December of 2014 where Shell Point reached out and said, you know, we understand you're interested in assuming the loan. Please send us these documents. There was a subsequent letter in January of 2015 where the Sims asked Shell Point to postpone the foreclosure sale. Shell Point wrote back in January 30th of 2015 and said, yes, we will postpone the foreclosure sale to allow us to consider you for this loan assumption, but we still need these certain documents. Okay. In March of 2015, Shell Point again wrote Mr. Sims and advised him that they needed certain documents which were not previously provided and that the Sims needed to provide those documents, and they did not. And the same happened in June of 2015. There was still a dispute as to whether all of the financial documents requested were provided. And then after the June of 2015 letter, Mr. Sims filed the litigation in the district court, and the assumption process at that point was essentially abandoned in favor of litigation. To the third sort of, you know, class of allegations that Mr. Sims raised in the district court, we spoke previously about the statement from Ms. Cox. Again, that was, you know, it sort of gets to the larger theme here where Mr. Sims had the opportunity as a litigant to conduct discovery, to take subpoena her for her testimony, to really the only discovery that was issued was a request for documents in the district court. So, you know, under Lattimore, you know, although it's a discrimination case, Mr. Sims has a burden of production just like really any other case you typically, and he simply failed to prosecute his case and meet his burden of production to corroborate Ms. Cox's statement and establish a record from which the district court could have made, you know, any inference that discrimination arose, and that it would be proper for a jury trial. You know, also Mr. Sims suggested in his presentation today that there was this attorney for the mortgage company that he met with, and he alleges that, you know, because the question was asked as how did, you know, how does someone even know you're African American? And he says, well, your attorney saw me at this hearing and, you know, told ShellPoint, and it's this grand conspiracy that ShellPoint, you know, heard from its attorney that Mr. Sims was African American, and then at that point, you know, decided that they weren't, you know, that they were going to actively discriminate against him in the loan assumption process. First of all, that meeting was in 2010, so it's unclear how ShellPoint, who began servicing the loan four years later, would have been in cahoots with this foreclosure lawyer from the 2010 hearing. You know, Mr. Sims said that ShellPoint could have presented an affidavit from this attorney that he, you know, either didn't tell ShellPoint this or, you know, that you're basically refuting his allegation. That's not our job. As a defendant, he has the burden of production to come forward and substantiate his allegations, and the fact of the matter is he simply failed to substantiate his allegations and instead relies on speculation of discrimination, which simply is not sufficient to defeat summary judgment and take the case to trial. So taking all the evidence as favorably to Sims as the record permits, in which the district court did, no reasonable jury could have found that the Sims were turned down for their loan assumption because of race, and I'd ask this court to affirm the grant of summary judgment in favor of my client, ShellPoint Mortgage Servicing. Thank you, Counselor. Thank you. Mr. Sims? Your Honor, I'd like to refer to... page A141 of the record. In fact, this comes from... I used a supplemental appendix of Defendant Appellee New Pen Financial, LLC. Page A141, there's a dialogue. The dialogue says, beginning in 12-8-2014, 12-37-56 p.m., spoke with Mr. Tiffany and confirmed that Mr. and Mrs. Sims would like to assume the mortgage on the property. That was December 8th of 2014. Yet, on March 6th, 2015, in a letter sent to me by ShellPoint, it said, please note that until authorization to discuss the mortgage obligation with you is provided by Mr. Tiffany, ShellPoint will be unable to provide you with the total amount required to reinstate the mortgage. Your Honor, back in the 60s, there was a way that African Americans were allowed to vote. They had to go in in the South, and it was a jar with jelly beans, and you had to count the jelly beans. You could vote, but you got to figure out the jelly beans. This is the jelly beans. This is, yeah, we give you the right to apply for an assumption, but it's always... It wasn't the documents. It's always, we need to get Mr. Tiffany's authorization which they've never denied that they haven't gotten. As to meeting the burden, they filed a summary judgment motion, not us. They had the burden. It wasn't our burden. It was their burden. I don't have to stand here and quote Anderson v. Liberty Lobby. They had the responsibility to shift the burden, and they failed to do that with Katia Cox, who was a supervisor. Their own discovery indicates that. We were told to work with her, and that's what she told us, and all they had to do was... This information came on our deposition when I gave it. He had an opportunity when he filed a summary judgment motion to attach an affidavit. Your Honor, I'm asking that the court reverse the district court. There's sufficient evidence for a jury to find in our favor. Thank you very much. Thank you. Thanks to both sides, and the case will be taken under advisement.